OPINION
{¶ 1} Defendant-appellant, David Dewsnap, appeals the decision of the Clermont County Domestic Relations Court granting a divorce, finding him in contempt, and dividing property. We affirm the decision of the trial court.
 {¶ 2} David and plaintiff-appellee, Deborah Dewsnap, established a common-law marriage dating back to 1986 when the couple lived in Texas. Upon moving to Ohio, the *Page 2 
couple exchanged vows in a civil ceremony on November 18, 1993.
 {¶ 3} Deborah has a high school diploma, but no post-secondary education. From 1983 to 1985, Deborah was employed at Wal-Mart until she was diagnosed with colon cancer and had to leave her employment in order to receive medical attention. Deborah never returned to work and has not been employed since 1985 in any capacity other than earning a few hundred dollars as a direct-pay employee at the Veterans Administration Hospital and through house and pet-sitting arrangements.
 {¶ 4} David earned his bachelor's degree in Chemistry from Texas A M and has been employed by various companies over the past two decades with salaries ranging from $30,000 to $94,000. At the time the divorce proceedings began, David was living in Georgia but had been terminated from his job for excessive tardiness. While he remained unemployed for approximately one year, at the time of later proceedings he was employed with Amcore Flexibles in Madison, Wisconsin at a salary of $81,000 per year with the possibility of bonuses based on company performance and personal achievement.
 {¶ 5} In December 2005, Deborah filed for divorce citing incompatibility by virtue of irreconcilable differences. In a temporary order, David was instructed to pay Deborah $2,500 spousal support per month. In March 2006, when David had not complied with the order, Deborah filed the first of several motions for contempt. Her second contempt motion was filed in July 2006, at which time David was $10,863.35 in arrears.[1]
 {¶ 6} The divorce hearing and contempt motions were submitted to a magistrate who, after a full hearing at which both David and Deborah testified, issued a decision in April 2007. After both parties filed objections to the decision, the magistrate filed an amended *Page 3 
decision in May 2007. Both parties objected to the amended decision. In its decision and entry on objections, the trial court extended David's spousal support obligation from four years to six years, and adopted the magistrate's decision in all other respects.
 {¶ 7} The trial court then entered a decree of divorce in August 2007 on grounds of incompatibility. The court also found David in contempt twice for failing to abide by its orders. The court awarded the marital home to Deborah, divided personal property, allocated frequent flyer miles, assigned vehicles, and divided various marital assets and debts.
 {¶ 8} Specifically, the trial court awarded David three accounts which had been liquidated prior to the final divorce decree. The accounts, Janus, Mainstay, and Honeywell, had approximate cash values after tax and penalties of $5,792.32, $2,467.50, and $4,297.96 respectively. David was also awarded his retirement accounts with a total value exceeding $133,000, although Deborah was assigned a 50 percent marital portion of the accrued amounts. Deborah was also awarded her IRA e-trade account which had an approximate value of $21,044.24.
 {¶ 9} The court also divided the marital debt. Deborah was assigned a credit card debt of more than $5,000, and was instructed to refinance the remaining mortgage on the home or sell it if she were to fall behind and miss more than two payments. David was assigned credit card debt in excess of $37,000. The magistrate's decision set spousal support at $2,250 per month until the earliest of four years time passage, Deborah's death, remarriage, or cohabitation with an unrelated adult in a marital-like relationship. However, as mentioned above, upon adopting the magistrate's decision, the trial court modified the length of David's support obligation to six years. The trial court stated that any arrearages in spousal support as of November 17, 2006 had been considered and accounted for in the property recapitulation. It is from this decision that David now appeals, raising four assignments of error. *Page 4 
 {¶ 10} Assignment of Error No. 1:
 {¶ 11} "THE TRIAL COURT ERRED WHEN IT FAILED TO CORRECTLY CALCULATE THE PROPERTY DIVISION WHEN IT INCLUDED ASSETS WHICH HAD ALREADY BEEN LIQUIDATED AND DIVIDED BY PREVIOUS COURT ORDER."
 {¶ 12} In his first assignment of error, David argues that the trial court[2] erred by failing to equitably divide the parties' marital assets. Specifically, he asserts that it was error to include in his portion of the marital property the Janus, Mainstay, and Honeywell accounts which the court had previously ordered liquidated and partial proceeds paid to Deborah. This argument lacks merit.
 {¶ 13} When presented with a divorce matter, a reviewing court will apply an abuse of discretion standard so that the trial court's decision will not be reversed unless it is unreasonable, arbitrary, or unconscionable. Smith v. Smith, Butler App. No. CA2005-04-091,2006-Ohio-2136, referencing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Upon review, an appellate court may not substitute its judgment for that of the trial court. In re Jane Doe 1 (1990),57 Ohio St.3d 135.
 {¶ 14} R.C. 3105 governs divorce proceedings and vests the responsibility of dividing marital property in the trial court. According to 3105.171(A)(3)(a), marital property includes any real and personal property currently owned by either or both spouses. "A potentially equal division of assets is the starting point from which the trial court decides a final equitable *Page 5 
distribution; however, after the court considers all relevant factors, there is no requirement that the division finally ordered by the trial court be exactly equal." Wiggins v. Wiggins (Apr. 11, 1994), Warren App. No. CA93-05-043, 8-9.
 {¶ 15} As instructed by the statutory precepts, the court will divide marital property equally unless doing so will be inequitable, in which case the court will endeavor to divide it equitably. R.C. 3105.171 (C). When a court divides property equitably instead of equally, it must make written findings of fact but its decision will not be disturbed if the reasons for division are made clear from its holistic decision and are apparent from the evidence presented. Smith at ¶ 13, 15.
 {¶ 16} "Marriage is a union of equals. Neither party should make a profit at the expense of the other. * * * This is why it is ill-advised and impossible for any court to set down a flat rule concerning property division upon divorce. A trial court must have discretion to do what is equitable upon the facts and circumstances of each case." Berish v.Berish (1982), 69 Ohio St.2d 318, 320, citing Cherry v. Cherry (1981),66 Ohio St.2d 348, 355. "Furthermore, a reviewing court is required to examine the overall equity of the division of marital assets, and not to conduct a line-by-line analysis of every item of marital property."Waller v. Waller, Jefferson App. No. 04 JE 27, 2005-Ohio-4891, ¶ 7. Instead of reviewing discrete aspects of the trial court's division decision, an appellate court should focus its analysis on "whether the trial court's disposition of marital property as a whole resulted in a property division that was an abuse of discretion." Thomas v.Thomas, Butler App. Nos. CA2002-05-130, CA2002-06-140, 2003-Ohio-5982, ¶ 9.
 {¶ 17} David argues that the court improperly adopted the magistrate's decision to credit him with the Janus, Mainstay, and Honeywell accounts totaling approximately $12,557.78 when those funds had already been liquidated and separated in September 2006. However, after reviewing the record, we find no error in the court's decision to set off *Page 6 
these accounts against David's share of the marital assets.
 {¶ 18} As already mentioned, the January 2006 temporary court order instructed David to pay Deborah $2,500 per month, out of which she was to pay the mortgage and other household expenses. After David did not pay as ordered for three months, Deborah filed a motion for contempt. Also during this time, Deborah was forced to take out various cash advances on credit cards in order to pay the mortgage. At one point, Deborah took out a $5,000 cash advance from an MBNA America credit card so that she could pay the mortgage which David had failed to pay for three months. Deborah used the cash advance to pay the mortgage arrearage, various associated fees, and another mortgage payment. While the advance temporarily cured the mortgage arrearage, David still failed to pay support as ordered.
 {¶ 19} After a stay in the contempt proceedings was granted, Deborah renewed her motion in July 2006 because at that point, David's arrearages were in excess of $10,863.35. David asserted that he was unable to pay the support because he was unemployed and was not set to start a new job until late 2006.
 {¶ 20} Because of David's unemployment and inability to pay, the magistrate's August 2006 decision instructed him to liquidate the three accounts. The order states specifically that the proceeds "shall be applied first to any arrearage owed on the mortgage to the lender. The remaining proceeds from the three accounts shall be divided equally between the parties * * * from the liquidated funds, husband shall first pay the monthly mortgage payment directly to the mortgage lender. Thereafter, Husband shall pay Wife the sum of $1,400 per month * * *" When David failed to implement the order, Deborah filed another motion for contempt in September 2006.
 {¶ 21} David liquidated the Janus and Mainstay funds in September 2006 and in October, sent Deborah a check for $5,000 along with an accounting of how he distributed the *Page 7 
remaining proceeds.[3] While David asks this court to find the trial court abused its discretion by awarding him the three accounts as marital assets when he used the liquidated funds to send Deborah money and pay bills, it is obvious from the record that David used these funds specifically for his own benefit. David's arrearages, at the time of liquidation, were well over $10,000 and he was in danger of being held in contempt of court for his failure to pay Deborah support.[4]
 {¶ 22} David essentially argues that the trial court abused its discretion because it should have only credited him with half of the liquidated funds (or approximately $6,278.89) and set off Deborah's assets by the other half. However, in addition to the fact that David was merely paying his own debt when he disbursed funds to Deborah and paid other bills on her behalf, when the court divided marital debts, it assigned Deborah a portion of the credit card debt she accrued when paying the mortgage payments that David did not pay as ordered.[5]
Therefore, Deborah will not gain an advantage or any double credit, as she remains liable on that debt. Additionally, in the subsequent recapitulation, David was given credit for the $5,000 payment to Deborah which offset his obligation to Deborah created by the temporary orders. Lastly, the court accounted for the three liquidated accounts in its recapitulation so that after all calculations were made, David no longer had any arrearages of record. The trial court, therefore, properly considered the three liquidated accounts in *Page 8 
relation to all other marital debts and assets and its overall division was equitable.[6]
 {¶ 23} Because the trial court did not abuse its discretion by crediting David with the liquidated funds, as they were used directly by him for his own benefit, and the overall division was equitable, David's first assignment of error is overruled.
 {¶ 24} Assignment of Error No. 2:
 {¶ 25} "THE COURT ERRED IN ITS DETERMINATION OF THE LENGTH AND AMOUNT OF SPOUSAL SUPPORT IN THAT IT DID NOT PROPERLY CONSIDER THE LENGTH OF THE MARRIAGE AND THE COMPLETE FINANCIAL PICTURE OF THE PARTIES' CIRCUMSTANCES."
 {¶ 26} In his second assignment of error, David argues that the court abused its discretion by ordering him to pay Deborah $2,250 per month for six years. This argument is unpersuasive.
 {¶ 27} R.C. 3105.18(C) empowers a trial court to order a party to pay spousal support when the support is appropriate and reasonable. The statute sets forth several factors a court should consider when fashioning the support award including the parties': (a) income; (b) earning ability; (c) age, physical, mental and emotional conditions; (d) retirement benefits; (e) duration of the marriage; (f) employability; (g) standard of living established during marriage; (h) education; (i) assets and liabilities; (j) contribution to education of the other party; (k) time necessary to acquire education; (l) tax consequences; (m) lost income capacity due to marital responsibilities; and (n) any other factor that the court deems relevant and equitable. *Page 9 
 {¶ 28} In addition to the abuse of discretion standard cited above, a reviewing court must also take into consideration the trial court's central role in issuing spousal support orders. "Since it is axiomatic that a trial court must have discretion to do what is equitable upon the facts and circumstances of each case, it necessarily follows that a trial court's decision in domestic relations matters should not be disturbed on appeal unless the decision involves more than an error of judgment." Gamble v. Gamble, Butler App. No. CA2006-10-265,2008-Ohio-1015, ¶ 3, citing Booth v. Booth (1989), 44 Ohio St.3d 142,144. "When a trial court determines an amount of spousal support, `it is guided by law, but is controlled by equity * * * [because] whenever equity loses its existence, justice is denied.'" Carnahan v. Carnahan
(Mar. 3, 1997), Clermont App. No. CA96-08-072, 11, citing Simoni v. Simoni
(1995), 102 Ohio App.3d 628, 635.
 {¶ 29} In this case, there was ample support for the trial court's decision to award Deborah spousal support of $2,250 per month for six years. Although David argues that the trial court did not base its decision on the statutory factors and instead relied on case law, the magistrate's decision, as adopted by the trial court, went through each of the factors set forth in R.C. 3105.18(C).[7] Specifically, Deborah had no steady employment and over the course of the marriage, had only earned a few hundred dollars doing sporadic jobs. David, on the other hand, had earned as much as $94,348 in a single year and averaged between, $70,000 and $80,000 for most of the past decade. Regarding the relative earning abilities of the parties, the court noted that David has a "significantly greater earning ability" than Deborah. Deborah's cancer is currently in remission and she has no other physical impediments that make employment unfeasible. However, unlike David who already has *Page 10 
procured employment at $81,000 per year, Deborah does not have the education and ability to secure employment with a salary even close to what David earns.
 {¶ 30} Regarding the parties' age and general health, at the time of the proceedings, David was 45 and was in good health. Deborah was 53 and in addition to having had cancer in 1985 and a reoccurrence in 1998, suffers from high blood pressure and depression.
 {¶ 31} The court also considered the retirement benefits of the parties and concluded that while David has significant retirement accounts of which Deborah is entitled to half, David will continue to work at a much higher rate of pay so that his retirement will continue to accrue exponentially more than any future employment and retirement benefits Deborah may acquire.
 {¶ 32} The court calculated the duration of marriage based upon the origination of the Texas common law marriage in 1986 to the date of the final hearing in 2007 so that in total, it lasted over 20 years. Though David argues that the court failed to properly consider the correct length of marriage, we conclude that it did not. By David's own answer to a prehearing interrogatory, the couple held themselves out as husband and wife starting in 1986. The lower court did not abuse its discretion by using the inception of the common-law marriage to determine the duration of marriage.
 {¶ 33} The court also considered the parties' standard of living, and found that there was no evidence presented regarding the standard at which the couple lived during marriage except for the fact that Deborah did not work, they lived in a house with four bedrooms with a mortgage above $1,000 per month, and that they did not incur any substantial debt until David was terminated from his job in 2005.
 {¶ 34} The court also recognized that while David was a college graduate, Deborah had obtained a high school diploma. Further, while neither party directly or substantively contributed time or money to the education of the other party, the court noted that Deborah *Page 11 
had mentioned a desire to go back to school to obtain training to aid her search for employment.
 {¶ 35} When analyzing the assets and debts of the parties, the court cited to its calculations to demonstrate that after the divorce, the parties would have approximately the same assets, though Deborah's would be less liquid in the sense that most were vested in the marital home. The court also noted that Deborah's spousal support would be taxed as income and that over the course of the marriage, she had lost income production capability because she stayed at home to care for the home and to tend to marital responsibilities while David worked.
 {¶ 36} With regard to the catch-all provision of R.C. 3105.18(C)(1)(n), the court considered two additional facts. The court found that Deborah's reasonable monthly expenses were $2,750, but then offset that amount because of Deborah's choice to care for five dogs and three cats and keep the four-bedroom house when only she would be living there. Based upon these additional considerations, the court found that support of $2,250 for six years was reasonable.[8]
 {¶ 37} It is obvious from the record that the underlying magistrate's analysis and the trial court's decision took into consideration all the statutory factors, including the parties' financial circumstances, so that the order of spousal support was appropriate and reasonable. We find no abuse of discretion in the trial court's decision to award Deborah spousal support as it did. David's second assignment of error is overruled.
 {¶ 38} Assignment of Error No. 3:
 {¶ 39} "THE DECISION FAILS TO DISPOSE OF THE MORTGAGE ON THE MARITAL REAL ESTATE." *Page 12 
 {¶ 40} In his third assignment of error, David argues that the trial court abused its discretion when it ordered him to convey his interest in the marital home by quit claim deed but did not otherwise release him of his obligation on the mortgage. He also asserts that the court acted arbitrarily by assigning him various deadlines while not setting forth the same for Deborah. These arguments lack merit.
 {¶ 41} David essentially argues that though the court ordered Deborah to refinance the mortgage or sell the home if she were to miss two payments, such an order obligates him indefinitely on the mortgage. First, it should be noted that David did not specifically object to the magistrate's decision to grant Deborah the marital property without expressly releasing him from the mortgage obligation. According to Civ. R. 53(D)(3)(b)(iv), "a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, * * * unless the party has objected to that finding or conclusion * * *." After Deborah filed objections to the magistrate's decision, David filed cross-objections which asserted that the magistrate erred by doing the following: (1) failing to credit him with various payments he made towards the marital debt during the pendency of the proceedings; (2) finding him in contempt; (3) allowing him only seven days to pay the property settlement; (4) not adjusting the settlement to reflect the liquidated accounts; (5) ordering him to pay certain debts under the given circumstances; (6) "for other errors apparent in the record." David also reserved the right to supplement his objections, but he did not do so.
 {¶ 42} Second, if the catch-all phrase in the sixth cross-objection was meant to cover the mortgage situation, the trial court did not abuse its discretion by ordering the mortgage disposal as it did. As ordered in the trial court's Judgment Entry Decree of Divorce, Deborah was awarded the marital home and was instructed to "assume, pay and hold[David] harmless with respect to any expenses associated with theproperty, including but not limited to, the mortgage to Bank ofAmerica in the approximate amount of $104,730.16 * * * Unless *Page 13 
otherwise agreed between the parties in writing, [Deborah] shall make reasonable efforts to refinance the mortgage against the marital residence within ninety days of the date of the filing of the Decree of Divorce. In the event [Deborah] is unable to refinance and in the event that [Deborah] misses two consecutive mortgage payments, then [Deborah] shall immediately list the real estate * * *." (Emphasis added.) The court then detailed how the property is to be sold and how the process will occur and also retained jurisdiction over the matter. If Deborah obeys the order and refinances the debt, David's obligation will be terminated.[9] In the alternative, if Deborah fails to make payments then she will be forced to sell the home, consequently terminating David's obligation. Therefore, David's obligation on the mortgage is limited by the court order. Should Deborah fail to adhere to the order, David has the option to move the court to enforce its order to have the marital home sold.
 {¶ 43} David also points out that the trial court placed several deadlines for him to adhere to when implementing the court's orders. These deadlines include signing the deed within seven days and paying his division-of-assets obligation within 14 days of the divorce decree's journalization. However, David asserts that no specific deadline was announced by which Deborah would have to refinance the mortgage or transfer her possession of the personal property that was awarded to David. While David claims that the court's failure to provide concrete deadlines to Deborah, as it did to him, was arbitrary, unfair, unconscionable, and unreasonable, we do not agree.
 {¶ 44} Regarding the lack of a specific date to transfer personal property, when no specific date is listed by which payment or division must be made, a court will apply a reasonable length of time standard.McFarland v. McFarland, Licking App. No. 01CA00021, 2001-Ohio-1843. Should Deborah fail to comply with the court's order to relinquish *Page 14 
possession of David's personal property within a reasonable time, the court can be asked to enforce its order. See Hueber v. Hueber, Clermont App. Nos. CA2006-01-004, CA2006-02-019, CA2006-02-020, 2007-Ohio-913, ¶ 32
(finding "no abuse of discretion in the trial court's application of a reasonable length of time standard where the decree did not provide a specific time frame for payment"). While the court did not specifically state a deadline for Deborah to convey possession of the personal property awarded to David, the omission was not an abuse of discretion warranting reversal.
 {¶ 45} The trial court's decision to give David strict deadlines was reasonable based on the history of the parties in this case. David now asks this court to find that the trial court abused its discretion by placing strict deadlines on him as a party who has in the past failed to adhere to the court's mandates while choosing not to place similar restrictions on Deborah as a party who has demonstrated compliance and a willingness to cooperate throughout the proceedings. As the trial court is granted ample discretion in both creating and implementing its domestic relations orders, its decision to set or not set deadlines is not an abuse of discretion. David's third assignment of error is overruled.
 {¶ 46} Assignment of Error No. 4:
 {¶ 47} "THE COURT ERRED BY FINDING APPELLANT IN CONTEMPT."
 {¶ 48} In his fourth assignment of error, David argues that the court should not have found him in contempt because he had made a good faith effort to procure employment and because he did not willingly defy the court's orders to make the mortgage payment and provide Deborah with spousal support. This argument is unpersuasive.
 {¶ 49} The Ohio Supreme Court has defined contempt as "disobedience of an order of the court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." Windham Bank v.Tomaszczyk (1971), 27 Ohio St.2d 55, paragraph one of the syllabus. Civil *Page 15 
contempt is a sanction imposed to coerce the offending party to comply with an order of the court. Oatey v. Oatey (Feb. 6, 1997), Cuyahoga App. No. 70630. Before a court can hold a party in contempt, the moving party must establish by clear and convincing evidence that a valid court order existed, that the contemnor had knowledge of the order, and violated such order. Hueber. "Clear and convincing evidence is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." Id. at ¶ 16, quoting Davis v.Davis, Clark App. No. 06-CA-17, 2007-Ohio-322, ¶ 27.
 {¶ 50} The movant need not prove that the contemnor's violation was purposeful, willing, or intentional. Pugh v. Pugh (1984),15 Ohio St.3d 136. Instead, "it is irrelevant that the transgressing party does not intend to violate the court order. If the dictates of the judicial decree are not followed, a contempt violation will result." Id. at 140. Once the movant establishes this prima facie case of contempt, the burden then shifts to the contemnor to prove his inability to comply with the court order. Keeley v. Kee/ey (July 21, 1997) Clermont App. No. CA97-02-013. However, the inability which excuses compliance cannot be self-imposed, fraudulent, or due to an intentional evasion of the order. Id.
 {¶ 51} An appellate court will review a finding of contempt using an abuse of discretion standard so that reversal is not appropriate unless the trial court's decision was arbitrary, unreasonable, or unconscionable. Edwards v. Edwards, Warren App. No. CA2006-04-044,2007-Ohio-123.
 {¶ 52} In the case at bar, the trial court issued multiple orders which David failed to obey. Beginning with its January 2006 temporary order allocating spousal support, David failed to pay Deborah monthly spousal support of $2,500. In August 2006, the court ordered David to pay the mortgage on the marital residence and to pay Deborah $1,400 per month for spousal support. After David failed to abide by these direct court orders, Deborah filed contempt motions in July and September 2006 and another in January 2007. After *Page 16 
hearings, [10] the court found that David's failure to comply constituted contempt and sentenced him to 30 days in jail and ordered him to pay Deborah's attorney fees relating to the contempt proceedings.[11] However, the court stated that David could purge the contempt and jail sentence by paying what he owed under the court orders.[12]
 {¶ 53} Through the testimony elicited during the hearings, [13] the record demonstrates that David had knowledge of these valid court orders, and that he disobeyed them by not making the requisite mortgage and spousal support payments. Although David argues that he was not employed and therefore unable to pay the mortgage and spousal support, the record demonstrates that the trial court took David's circumstances into consideration and even allowed David to liquidate some of his funds in order to comply with the orders to provide Deborah spousal support and pay the mortgage.
 {¶ 54} David essentially argues that he met his burden of proving that he was unable to follow the order because he was unemployed and could not make the mortgage or spousal support payment as ordered. However, in its ruling on objections to the magistrate's decision, the trial court found that David "failed to establish his inability to comply with the orders." We find no error in this conclusion. As already stated, David was terminated from *Page 17 
his employment due to excessive tardiness. While it is undisputed that David remained unemployed for approximately one year following his termination, the court permitted him to liquidate some of his accounts so that he would have the funds necessary to pay the mortgage and provide Deborah with spousal support. However, David still failed to cure the arrearages as ordered. The court did not abuse its discretion by finding that David failed to establish an inability to comply with the orders.
 {¶ 55} The trial court's decision to find David in contempt was supported by clear and convincing evidence and was not an abuse of discretion. David's fourth assignment of error is overruled.
 {¶ 56} Judgment affirmed.
WALSH, P.J., and POWELL, J., concur.
[1] As discussed in greater detail under David's fourth assignment of error, the court held him in contempt three separate times for failure to obey the court's orders regarding making mortgage payments and providing spousal support.
[2] {¶ a} Civ. R. 53(D)(4)(a) states that before a magistrate's decision is effective, a court must adopt it. Additionally, "if one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. * * * A court that adopts, rejects, or modifies a magistrate's decision shall also enter a judgment or interim order." Civ. R. 53(D)(4)(d)-(e).
{¶ b} "The trial court, as the ultimate finder of fact, must make its own factual determinations through an independent analysis of the issues and should not adopt the findings of the [magistrate] unless the trial court fully agrees with them." Hampton v. Hampton, Clermont App. No. CA2007-03-033, 2008-Ohio-868, ¶ 14, citing Inman v. Inman (1995),101 Ohio App.3d 115, 118. In the case at bar, the trial court specifically ratified and affirmed the magistrate's decision. Therefore, it is apparent that the trial court agreed with the magistrate's findings so that those conclusions impact this appeal.
[3] David itemizes the accounting by listing the total proceeds from the Janus and Mainstay accounts as $8,259.82. From that amount, David subtracts the following debits: $350 to Citibank; $800 to Wachovia; an Ohio energy bill of $556.47; $1,135.37 for the November mortgage payment; $94.63 to Cingular; and $425 for an insurance policy. Along with the $5,000 check to Deborah, the itemization accounted for $8,361.47 of the liquidated accounts. The record does not contain a similar accounting for when or how David used the remaining funds once the Honeywell account was liquidated.
[4] See Hoffman v. Hoffman (Aug. 11, 1994), Franklin App. No. 94APF01-48, 1994 WL 424998 at 4-5 (affirming trial court's decision to take into consideration husband's noncompliance with court order to pay marital debt, mortgage payment, and child support by awarding husband $40,000 less in assets than wife when the court later relieved him of child support obligations which accrued pursuant to the temporary orders that had been in arrears).
[5] The court assigned the approximate $5,000 debt owed to MBNA America to Deborah in the final decree.
[6] A trial court has the discretion to assign credit for marital property that is no longer in existence at the time of the final divorce decree. See Berish, 69 Ohio St.2d at 320-321 (stating that "if a trial court was rendered powerless to recognize and determine property rights in assets that do not exist at the time of the final decree, one party, from the time of separation to the time of the final decree, could withdraw all funds and, unilaterally and with impunity, squander the fruits of the marital labor. Such a position would not only be antithetical to public policy, but also to prior case law").
[7] According to Civ. R. 53(D)(4)(b), "a court may adopt or reject a magistrate's decision in whole or in part, with or without modification * * *." Within its province, the court adopted the magistrate's decision in regards to the statutory analysis and modified it by extending the length of spousal support. The modification, however, did not nullify the magistrate's findings regarding the statutory factors.
[8] As previously stated, the trial court adopted the magistrate's decision in full except that it extended David's obligation from four years to six.
[9] At the time of brief writing and submission, Deborah had already begun the refinancing process.
[10] The court heard the first two motions, filed on July 11, 2006 and September 28, 2006, and incorporated its decision holding David in contempt into the decree of divorce filed August 8, 2007. In a separate proceeding, stemming from the motion filed January 5, 2007, the magistrate heard the contempt charge on May 25, 2007 and issued a decision holding David in contempt on October 4, 2007.
[11] In the final judgment entry, the court ordered David to pay $500 for each instance he was found in contempt for a total of $1,000 in attorney fees. This amount was in addition to the $6,035 in general attorney fees awarded to Deborah during the divorce proceeding. Although David was found in contempt again in October 2007, David moved for a continuance of the purge review/sentencing hearing due to the pendency of this appeal.
[12] See State v. Kilbane (1980), 61 Ohio St.2d 201, 206-207 (holding that "if the contempt is civil the sanction is primarily coercive in nature and must allow for purging").
[13] David submitted transcripts of the hearing held on November 17, 2006 during which the court heard testimony regarding Deborah's divorce complaint and her July and September 2006 contempt motions. The record also contains the transcripts of the May 25, 2007 contempt hearing, during which the magistrate heard testimony regarding Deborah's January 5, 2007 motion. However, while a second hearing was apparently held on October 24, 2006, David failed to include this transcript in the record. *Page 1